IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 7, 2003

## TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES v. R.G.T.

Appeal from the Juvenile Court for Greene County
No. 16056     Thomas J. Wright, Judge

FILED MAY 30, 2003

No. E2002-02804-COA-R3-JV

The trial court terminated the parental rights of R.G.T. ("Father") to his minor child, L.B.T. (DOB: September 20, 2000).  Father appeals, arguing that the evidence preponderates against the trial court's dual findings, *i.e.*, (1) that grounds exist for terminating his parental rights and (2) that termination is in the best interest of L.B.T.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and D. MICHAEL SWINEY, J., joined.

J. Russell Pryor, Greeneville, Tennessee, for the appellant, R.G.T.

Paul G. Summers, Attorney General and Reporter, and Douglas Earl Dimond, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I.

On September 21, 2000, the Tennessee Department of Children's Services ("DCS") filed a petition for temporary custody of one-day-old L.B.T.  The petition alleges that L.B.T. was a dependent and neglected child "in that the parents . . . by reason of mental incapacity are unfit to properly care for such child."  The petition goes on to state that the court had previously terminated the parental rights of Father and N.J.T. ("Mother")[1] with respect to their other children, the siblings

---

[1]Mother's parental rights to L.B.T. are not at issue on this appeal.

of L.B.T. ("the child")[2]  When the child came into the custody of DCS, she was placed in the home of the family that had adopted her four siblings.

On December 6, 2000, DCS filed a petition to terminate the parental rights of Father and Mother to the child.  Four months later, the trial court entered an order, finding that the child was dependent and neglected due to the mental incapacity of the parents and awarded continued custody of the child to DCS.  In addition, the trial court granted the parents the option of exercising supervised visitation with the child, ordered the parents to undergo a new psychological evaluation, and adopted the permanency plan filed by DCS.

Visitation with the child did not go well.  A quarterly progress report submitted by the child's DCS case manager on June 29, 2001, addresses the parents' visitation thusly:

> The foster mother . . . has to remain in the room at all times because [the child] will not tolerate being alone with her parents.  She cries and screams continuously if her foster mom leaves her, even briefly.

Two and a half months later, the parents filed an answer to the petition to terminate, alleging that DCS "comes to Court with unclean hands" because of its refusal to allow the parents to visit with the child.  On the same day the parents filed their answers, the trial court entered an order terminating visitation.  The order states that the matter had been pending before the trial court since December 6, 2000; that the case had been reset three times due to defense counsel's difficulty in obtaining an independent psychological evaluation; that the only issue that remained to be litigated was the mental and psychological health of the parents; and that the termination hearing would proceed as scheduled on October 3, 2001.

On October 1, 2001, counsel for the parents deposed psychologist Nancy L. Lanthorn, Ph.D., who had performed the psychological evaluation of the parents. Dr. Lanthorn testified that she could say within "a 95% degree of confidence [Father] has an IQ of between 64 and 72."  She further stated that this IQ placed Father in the "extremely low to borderline range of intellectual functioning," which was previously classified in psychological terms as mild mental retardation.  While Dr. Lanthorn agreed with DCS that Father was mentally incompetent to parent the child, she opined that Mother was competent to parent the child and that Father and Mother "work nicely as a team."

Apparently based upon the results of the psychological evaluation, DCS dismissed the petition to terminate on October 2, 2001.  At the end of the month, the trial court entered an order which allowed the parents to have supervised visitation with the child.  The order also stated that DCS could videotape the visitation, starting with the parents' third visitation session.

---

[2]On December 8, 1999, the court had found, by clear and convincing evidence, that grounds existed for terminating the parental rights of Father and Mother to their other four children, ranging in age from six to thirteen, and that termination of parental rights was in the best interest of the children.  The grounds for termination included the persistence of the conditions that led to the removal, the mental incompetence of the parents, and the failure to substantially comply with the foster care plan.

On December 19, 2001, DCS filed a new petition, this time seeking to terminate visitation. DCS alleged that the videotapes of the visitation sessions "demonstrate the parents' inability to calm the child during the visitation period." The December 27, 2001, quarterly progress report recites the following:

> The child screams during the entire visitation with her parents unless she cries herself to sleep.
>
> * * *
>
> The parents do not have a relationship of any kind with this child. She screams and cries whenever she sees them. She is normally a very well adjusted child. However, when the child sees her natural parents she has an adverse reaction.

In January, 2002, Father and Mother separated. Five months later, DCS filed a petition to terminate Father's parental rights, alleging, *inter alia*, that he had willfully abandoned the child by failing to pay child support, that the conditions which led to the child's removal persisted, and that he was mentally incompetent to parent the child. After a full hearing, the trial court terminated Father's parental rights. In the final judgment, entered November 14, 2002, the court below found, by clear and convincing evidence, that grounds for terminating Father's parental rights existed and that termination was in the best interest of the child.

## II.

In this non-jury case, our review is *de novo* upon the record of the proceedings below; but the record comes to us with a presumption of correctness as to the trial court's factual determinations – one that we must honor unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). The trial court's conclusions of law, however, are accorded no such presumption. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993).

## III.

It is well-settled that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). However, this right is not absolute and may be terminated if there is clear and convincing evidence justifying termination under the pertinent statutory scheme. *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Clear and convincing evidence is evidence which "eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence." *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995).

The issues raised in the pleadings, the evidence presented at trial, and the trial court's findings, bring into play several statutory provisions. Particularly pertinent are the provisions dealing with a parent's "mental condition." All of the termination statutes implicated by the facts of this case are as follows:

*Tenn. Code Ann. § 37-1-147 (2001)*

(a) The juvenile court shall be authorized to terminate the rights of a parent or guardian to a child upon the grounds and pursuant to the procedures set forth in title 36, chapter 1, part 1.

* * *

*Tenn. Code Ann. § 36-1-113 (2001)*

(a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

* * *

(g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:

(1) Abandonment by the parent or guardian, as defined in [Tenn. Code Ann.] § 36-1-102, has occurred;

* * *

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

*(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;*

*(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and*

*(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.*

\* \* \*

(8)(A) The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child.

(B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

*(i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future, and*

(ii) That termination of parental or guardian rights is in the best interest of the child.

\* \* \*

*Tenn. Code Ann. § 36-1-102 (Supp. 2002)*

As used in this part, unless the context otherwise requires:

(1)(A) "Abandonment" means, for purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or make reasonable payments toward the support of the child;

(ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date;

* * *

(D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means that, for a period of four (4) consecutive months, no monetary support was paid or that the amount of support paid is token support;

(Emphasis added).

IV.

Father raises four issues for our consideration: (1) whether the evidence supports the trial court's finding of abandonment for willful failure to support; (2) whether the evidence supports the trial court's finding that DCS made reasonable efforts to prevent the removal of the child; (3) whether the evidence supports the trial court's finding of grounds for termination based upon Tenn. Code Ann. § 36-1-113(g)(3)(A)(i)-(iii) and (g)(8)(B)(i)-(ii); and (4) whether the trial court erred when it admitted into evidence the expert testimony of Dr. Lanthorn on the question of Father's mental competency.

A.

With respect to Father's abandonment of the child, the trial court found as follows:

> [T]he Court finds by clear and convincing evidence that the child has been abandoned within the legal definition of that term in that [Father has] willfully failed to support the child and make reasonable payments toward the support of the child for the four consecutive months immediately preceding the filing of the petition. Indeed, there's never been any payments made by either [Mother or Father] at any time during the life of the child. And in hindsight again, I should have ordered them to make payments. No doubt about that. Should have told them exactly how much. But I believe that the legal precedent is clear that it's not necessary for the Court to have done that in order to establish the willful failure to pay. If [Father] didn't know that [he] needed to take care of [his] own child financially, then that only confirms [his] inability to properly and safely care for [his] own child. So I make the finding by clear and convincing evidence based upon the fact that [Father has] never paid anything and . . . that item has been established as a ground for termination.

The statutory definition of "willfully failed to support" and "willfully failed to make reasonable payments toward a child's support," as defined in Tenn. Code Ann. § 36-1-102(1)(D), was held to be unconstitutional by the Tennessee Supreme Court in the case of *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999). The court in *Swanson* stated that, pending legislative action to cure the statute's constitutional infirmity, actions in juvenile court seeking to terminate parental rights for abandonment based upon a failure to support would be controlled by the statutory definition of abandonment in effect prior to the enactment of the adoption code, effective January 1, 1996. Under the prior provision, which, under *Swanson*, now controls the issue, an abandoned child was defined as one "whose parents or other persons lawfully charged with his [or her] care and custody . . . willfully fail to support or make payments toward his [or her] support for a period of four (4)

-7-

consecutive months." Tenn. Code Ann. § 37-202(7) (Supp. 1970) (repealed effective January 1, 1996). *See* **Pack v. Rogers**, 538 S.W.2d 607, 609, 610 (Tenn. Ct. App. 1976).

Father argues that his failure to pay child support could not have been willful, as he had no knowledge that he needed to pay child support. At the time of trial, Father was 44 years old and had achieved only an eighth grade education. In addition, Father is unable to read. Father contends that DCS failed to make him aware of his obligation to support his child. Further, Father asserts that "it was logically inconsistent for [DCS] to argue and the trial [c]ourt to find that Father is incompetent, while at the same time arguing/finding that Father could [have] intentionally fail to pay support."

By Father's own admission, he has never paid any support for the child. He also admitted that he has never taken the child any birthday or Christmas cards, and the only gift Father could recall giving the child was taken to her by Mother at the child's first Christmas. Father asserts that he was under no court order to pay child support. In response to such an assertion in a previous case, this Court stated that "the support of one's children should not be conditioned upon whether one has been placed under a court order to do so." **State Dep't of Human Servs. v. Manier**, C/A No. 01A01-9703-JV-00116, 1997 WL 675209, at *5 (Tenn. Ct. App. W.S., filed October 31, 1997). With respect to Father's argument that he was unaware of his responsibility to pay child support due to his inability to read and his mental deficiency, we agree with the trial court that such an assertion tends to support the position of DCS that Father is unable to properly parent his child. In any event, the evidence does not preponderate against the trial court's finding that there was clear and convincing evidence of Father's abandonment of the child.

B.

Father next contends that the trial court erred in determining that DCS made reasonable efforts to prevent the removal of the child, as set forth in Tenn. Code Ann. § 36-1-102(1)(A)(ii). In ruling on the reasonable efforts of DCS, the trial court stated the following:

> [T]here really wasn't any effort made on behalf of [Father] to assist him in doing anything. Basically, you were given up on. There's no doubt about it. Perhaps that's an interesting legal issue for the Appellate Courts to discuss, whether or not in light of the evidence presented to the caseworker that was reasonable. I find that it was reasonable in light of what [the caseworker and DCS were] presented with, which was my fresh ruling that [Father] was incompetent and was not likely to become competent, and the subsequent evaluations that [the caseworker] was apprised of which continued to indicate that [Father] was not going to be capable of properly parenting the child, and I make that finding by clear and convincing evidence.
>
> With regard to [Mother] and also somewhat to the extent of [Father], there are significant indications I think from Appellate Courts that

[DCS's] role or the onus on [DCS] is significantly greater perhaps than has been operated under in the past, . . . . But certainly, the parents continue to have a responsibility to take action themselves and the Court finds that [Father and Mother] did not act reasonably in failing to take action in order to attempt to complete a Plan of Care and to address the issues that were preventing the child from residing with either of them. . . .

Based upon that factor I think the Court can find and does find that those omissions on behalf of [Father and Mother] who the Court finds to have been extremely, extremely well-versed in dealing with [DCS] as well as other social services agencies through the course of their previous children's termination and foster care, I find that their omissions amount to a demonstrated lack of concern for the child to the degree that it appears unlikely that they'd be able to provide a suitable home for the child.

Tenn. Code Ann. § 36-1-102(1)(A)(ii) contemplates that DCS will make reasonable efforts to prevent the child in question from being removed from the home of the parents, *unless* "the circumstances of the child's situation prevent[] reasonable efforts from being made prior to the child's removal." In the instant case, the parental rights of Father and Mother had been terminated with respect to their other four children less than one year prior to the birth of the child in question. DCS's prior, fresh history with respect to these parents certainly must be factored in when evaluating the sufficiency of DCS's efforts prior to removing the child. We agree with the trial court that the actions of DCS were reasonable in light of the parents' history with DCS and the previous termination proceedings. Accordingly, we find that the evidence does not preponderate against the trial court's findings with respect to reasonable efforts by DCS.

C.

In addressing the issue of failure to remedy the conditions preventing the return of the child, the court found as follows:

The conditions which still persist are those generally that were talked about in the Plan of Care and discussed in the argument of the guardian ad litem that [Father and Mother] are still in no position to be able to adequately provide for a child. I think [the guardian] is exactly right about that. Those were not the conditions which caused the child to be removed necessarily. What caused the child to be removed is that it was just a few short months prior to the birth of the child this Court had found that [Father and Mother] were incapable of properly parenting a child and therefore ordered that this child also be removed from their custody.

I don't find there to have been any significant change in their parenting abilities or in their mental or emotional abilities since I previously found them to be incompetent. So from that standpoint that condition which led to the removal of the child I find by clear and convincing evidence does persist and that there are other conditions including their instability of their living arrangements and their inability to provide an income to support a child as well as the lack of parenting ability as demonstrated on the videotape in particular, and through the other testimony as well that would, in all probability, cause the child to be subjected to neglect in the future and make it unsafe to return the child to either one of them's custody.

The Court finds by clear and convincing evidence that there is little likelihood that these conditions could be remedied at an early date and that the continuation of the legal parent and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home.

The evidence does not preponderate against these factual findings by the trial court. On the contrary, there is ample evidence to support the trial court's findings that, due to Father's mental incompetency, he will be unable to remedy his lack of parenting skills in the near future, and that the continuation of Father's legal relationship with the child will greatly diminish the child's chances of an early integration into a stable home environment.

D.

With respect to the competency of Father, the court stated the following:

With regard to [Father], the Court finds that the allegation of incompetency to provide for the child and to adequately parent the child has been established by clear and convincing evidence and that it is unlikely that he would be able to address the impairment from which he suffers so as to be able to assume the care and responsibility of the child in the near future. The near future has now already passed and essentially, as [the guardian ad litem] said, there's not anything that's happened. There's really not anything that's new other than that they have split up and that [Mother] has adopted what is now referred to as an alternative lifestyle apparently. But the evidence that is before the Court indicates that [Father] would remain subject to that incompetency finding as I found in the previous hearing some years ago, and specifically without reference to the deposition of Dr. Lanthorn[], the Court finds that the ground will be established by not only the Court's previous finding, but the

-10-

testimony of the lay witnesses here today as well as the fact through [Father's] testimony that he now receives disability benefits at least in part because of his mental disability. The Court notes for the record that he apparently received an award which said he was disabled back to 1997 at which time he was currently working on a dairy farm, and did again in 2001 indicating that the back injury was not the significant portion of the disability. At least, that's what I find by clear and convincing evidence.

Father argues that the trial court's finding of incompetency "was based upon certain 'expert testimony' which was introduced at trial in the form of a deposition and other writings." Father further contends that the testimony of Dr. Lanthorn was inadmissible hearsay, that the testimony did not meet the requirements of Tenn. R. Evid. 702 & 703 or the requirements of *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997), and that none of the opinions expressed by Dr. Lanthorn were stated within a "reasonable degree of scientific certainty."

We find Father's assertion puzzling, in view of the trial court's statement that it was finding Father incompetent *"specifically without reference to the deposition of Dr. Lanthorn."* (Emphasis added). Instead, the court based its decision on its previous adjudication of incompetency and the fact that it could see no improvement in Father's mental condition; the testimony of other lay witnesses; and the fact that Father has been awarded disability, at least in part, for his mental condition. Since Dr. Lanthorn's testimony was not relied upon by the trial court, the error, if any, in receiving her testimony into evidence was harmless.

V.

Finally, we conclude that the evidence contained in the record supports the trial court's finding that the termination of Father's parental rights is in the best interest of the child. The trial court summarized the factors pertaining to the child's best interest:

I have to address the best interest, whether it's in the child's best interest to terminate parental rights. The short answer to that is that the Court does believe it to be in the child's best interest and that that's been established by clear and convincing evidence. . . . The child has clearly bonded with the foster family and is in a position where it has lived with and formed a bond with its four biological siblings. The child is doing well. When the Court was forcing the visitation the child wasn't doing nearly as well and just had an awfully, awfully bad response to [Father and Mother] as evidenced by the videotape.

Specifically, the Statute requires that I address several factors which are set forth in [Tenn. Code Ann. §] 36-1-113(i) and are numbered

thereafter 1 through 9. With regard to item number 1, the Court finds that neither parent has made any significant adjustment of circumstance or conditions so as to make it safe for the child and in the child's best interest to return to their home.

Number 2, the Court finds by clear and convincing evidence that both the parents have failed to make a lasting adjustment after reasonable efforts by available social services agencies; so that a lasting adjustment does not reasonably appear possible. To a certain extent I'm basing that on the prior history of the other several years with the other kids.

Number 3 is a non-issue for the Court in this case because it involves whether they've maintained regular visitation. Of course, I terminated their visitation. Prior to that time they did maintain regular visitation the Court finds by clear and convincing evidence.

Number 4, the Court finds that no meaningful relationship was ever established between the biological parents and the child.

Number 5, the Court finds that it is likely that a change of caretakers and physical environment for this child would have a significantly adverse affect on the child's emotional/psychological condition.

Number 6, the Court does not find to have been a factor with regard to the child's best interest.

Number 7, the Court finds that there's not a great deal of evidence one way or the other with regard to [Mother], but that [Father] has demonstrated by clear and convincing evidence that he has a healthy and safe physical environment currently in his mother's home. There hasn't been any evidence about the use of alcohol or controlled substances by either of these parents. The Court finds that item number 7 does not preponderate in favor of termination or in favor of the child's best interest that its right be terminated.

Number 8, the Court does find that item number 8 has been established by clear and convincing evidence that the parents' mental and/or emotional status would be detrimental to the child and prevent the parent from effectively providing a safe and stable care and supervision for the child, and that the Court finds with regard to both [Father and Mother].

And number 9, obviously as I've already found, neither parent paid any child support.

Having considered those factors set out in the Statute as well as the overall factor that the Court's already mentioned regarding the current placement of the child and the child's forming a part of that family, the Court does find that it's in the child's best interest to terminate the parental rights of [Father and Mother] to the child, [L.B.T.] and therefore, the Court does so.

The evidence does not preponderate against these findings. Rather, the evidence believed by the trial court – much of which is alluded to in this opinion – shows in a clear and convincing manner that termination is in the child's best interest.

VI.

R.G.T. has filed a motion requesting that any costs that might be taxed to him be waived. We find the motion to be well-taken, and, accordingly, it is hereby granted.

VII.

The judgment of the trial court is affirmed. This case is remanded for enforcement of the trial court's judgment and for collection of costs assessed below, all pursuant to applicable law. Exercising our discretion, we tax the costs on appeal to the Tennessee Department of Children's Services.

_____
CHARLES D. SUSANO, JR., JUDGE